**Lester BELDNER and Ann Beldner, Plaintiffs-Appellants,**

v.

**GENERAL ELECTRIC COMPANY, and Kate Jones, if living, and if dead, then the unknown heirs, grantees, devisees, or successors of Kate Jones, Defendants-Respondents.**

No. 54116.

Supreme Court of Missouri, Division No. 1.

Feb. 9, 1970.

Motion for a Rehearing or to Transfer to Court En Banc Denied March 9, 1970.

Marvin Klamen, Clayton, for appellants.

William H. Ferrell, Fortis M. Lawder, Keefe, Schlafly, Griesedieck & Ferrell, St. Louis, for defendant-respondent, General Electric Co.

G. DERK GREEN, Special Judge.

Each of the parties to this action claims title to the same Missouri real estate and prays the judgment of the court finding and quieting the title in the pleader. From an adverse judgment the plaintiffs appeal. The jurisdiction on appeal is in this court. Sec. 3, Art. V, Constitution of Missouri, V.A.M.S.; Dalton v. Johnson, Mo.Sup., 320 S.W.2d 569.

Appellants, hereinafter referred to as plaintiffs, filed petition on July 13, 1964, filed amended petition on March 9, 1965 and on September 2, 1966 amended this petition by interlineation. In its final amended state, the petition alleged actual, open, notorious, adverse, continuous, undisputed, peaceful, exclusive and lawful possession of Lot 62 in Block G of the North Cabanne Subdivision in the City of Wellston, Missouri for more than ten (10) consecutive years next preceding the 28th day of August, 1961 and that such possession so continued until the filing of the petition. It also asserts certain easement or roadway rights over said lot and adjoining Lots 61 and S ½ of 63.

Respondent General Electric Company denied the allegations of the petition concerning the possession of Lots 61 and 62 by plaintiffs and in a counterclaim asserted title to those lots and the S ½ of Lot 63 by reason of a deed dated May 13, 1964. Other allegations of the Answer and Counterclaim will be referred to as they become pertinent to the issue discussed.

Plaintiffs also joined in the amended petition one Kate Jones as a former record title holder of Lot 62. A guardian ad litem appointed for her unknown heirs, grantees, devisees or successors participated to a limited extent in the trial, but has not appealed from the judgment of the court. References to the defendant herein will intend only the General Electric Company, a New York corporation.

The law with reference to establishing title by adverse possession has been often considered and the rules well defined. In order to establish title by adverse possession, plaintiffs had the burden of

proving that they and those under whom they claim had possession cf the land so claimed for the statutory period (10 years) and that such possession was actual, hostile, under claim of right, open and notorious, exclusive and continuous for the whole prescribed period of time. Hamburg Realty Company v. Walker, Mo.Sup., 327 S.W. 2d 155; Feinstein v. McGuire, Mo.Sup., 297 S.W.2d 513; Miller v. Warner, Mo.Sup., 433 S.W.2d 259. We will first consider whether plaintiffs have sustained their burden of establishing all of the elements of adverse possession essential to establishing title to Lots 61 and 62. The case was tried before the court without a jury, and we must review it upon both the law and the evidence as in suits of an equitable nature. Supreme Court Rule 73.01(d), V.A.M.R.; Mueller v. Larison, Mo.Sup., 355 S.W.2d 5.

Block G of the North Cabanne Subdivision is bounded on the north by Etzel Avenue, on the south by Spencer Place, on the west by the Wabash Railroad, and this particular portion of the block is bounded on the east by a small stream or creek known as River Des Peres. It is 200 feet between Etzel Avenue and Spencer Place. The block is divided into two tiers of lots, each being 100 feet north to south and 20 feet in width east to west except the most westerly lots adjoining the Wabash Railroad and these are wider at the north end than at the south end, due to the fact that the railroad crosses the east-west lines at a southeast-northwest angle. The lots on the south half of this block abut or front on Spencer Place, each with a frontage of 20 feet, except for Lot 63 which is next to the railroad and has a frontage on Spencer Place of only 14 feet. Next to the east on Spencer Place is Lot 62, and next to the east of that is Lot 61. The lots in the north half of this block are of the same size, with the exception of Lot 1 next to the railroad property and this is 40 feet 4¾ inches at its north end and 13 feet 10½ inches at the point it joins Lot 63. Next to this is Lot 2 which also abuts Lot 63 on the south, the northerly line of Lot 63

being 33 feet 10½ inches. Next to this is Lot 3 which abuts at the east-west center line of the block with Lot 62 and next to the east is Lot 4 which is directly north of Lot 61 and has a common boundary with Lot 61 at the center of the block.

Prior to March 31, 1959, Lot 3 and the north 50 feet or north half of Lot 63 were owned by the Marvel Oil Company and on that date the Marvel Oil Company executed a warranty deed conveying to plaintiffs said Lot 3 and the north 50 feet of ·Lot 63. Prior to the making of this deed, the Marvel Oil Company had been operating a fuel oil and gasoline business at this location and at the same time as the transfer of the real estate, this company sold to the plaintiffs the fuel oil business and items of personal property used in that business. The Marvel Oil Company, as it existed prior to March 31, 1959 was a corporation. On or about March 31, 1959, the plaintiffs took possession of the property at this location, both real and personal, and continued with the operation of a fuel oil business in much the same manner as had been conducted by the Marvel Oil Company previously, doing business under the name of Marvel Fuel Oil Company, although it was individually owned by the plaintiffs. They continued to so operate the business until the time of the filing of this action.

The plaintiffs did not testify in the trial. It was explained that plaintiff Lester Beldner had suffered a heart attack some time previously, and it was indicated that he was not physically able to appear in court. The principal testimony as to the occupancy and conditions thereof during this five-year period immediately following the transfer by Marvel Oil Company to plaintiffs and to the filing of the suit came from the plaintiffs' son, Mark Beldner. At the time of the trial, this witness was 23 years of age, which limits to some extent the period of time covered by his testimony. He said that there was a written contract at the time his father acquired the assets of the Marvel Oil Com-

pany, but this written agreement was not offered in evidence. They bought the property through a real estate agent, received an itemized list of assets the company was to transfer and went to the premises before completion of the transaction to see exactly what they were buying. At that time, they found steel tanks and loading facilities, pumps and other equipment on the north half of Lot 63 and found an office building, warehouse and garage on Lot 3. At the extreme southern end of Lot 3 was a one-story metal building used as a garage and warehouse. This building was 19 feet 4 inches wide, east to west, and 48 feet 10 inches long, north to south. The south edge of the building was directly on the property line between Lots 3 and 62 and extended over all but 8 inches of that common boundary. Entrance to this building was by two swing-out garage-type doors on the south end and these doors, when opened, extended out over Lot 62. There were a number of steel tanks, 25-gallon drums and 5-gallon drums in this area, some were in the warehouse and some were outside on Lots 62 and 61.

From the time they purchased this business, they continued to use the bulk plant and the whole operation as it had been used previously, supplying fuel oils and gasolines to customers and delivering those products in a retail and wholesale business. They made and blended their own motor oil. They blended the oil and put it in smaller cans or barrels and placed these on the lots to the south of the garage building or warehouse until they had need for them. They also stored empty cans or barrels on these lots until they were needed to be filled. At the time of the purchase of the business, there was one 2,000-gallon tank sitting on Lot 61. This was later moved and used for storage of gasoline. The Marvel Oil Company had conducted a similar business, making their own oil and with the transfer of the business to plaintiffs, one of the previous owners demonstrated to them the use of the equipment.

The metal building used as a garage or warehouse and located on the south end of Lot 3 was reached through the garage doors mentioned herein as opening out over Lot 62. During this last five-year period, motor vehicles belonging to plaintiffs were stored in this garage or warehouse during the night and on occasions when the business was not in actual operation. Usually three trucks were stored in this building when they were not in use for making of deliveries, but one particular truck was placed there every evening because of the hydrochloric acid gas, chlorine and other things kept on the truck that might be disturbed by vandals or be dangerous to people coming into contact with it. The only means by which these trucks could be placed in this building on Lot 3 was by driving them from Etzel Avenue over the Wabash Railroad right-of-way, over the north end of the south half of Lot 63 and over Lot 62 into the building. Generally the trucks were backed into the garage and this was accomplished by driving them southward over Lot 62 to Spencer Place and backing them northward on Lot 62 into the garage.

At one time, a part of this building was sublet by plaintiffs to a plumbing company for the storage of lead pipe and plumbing fittings and that company used the same route and the same manner of gaining access to the building for the delivery and removal of their material. At another time, plaintiffs permitted Rufus Davis, an asphalt or hauling man, to use the building for a place to overhaul his trucks or to work on equipment, and he used Lot 62 and the north part of the south half of Lot 63 for the purpose of going to and from the building while he so used it. There was only one way to get into this garage with a vehicle, and that was through the garage doors on the south end of the building and by driving over Lot 62.

At the time this business was acquired by plaintiffs, they acquired the three trucks referred to as being stored in the garage. Later, they purchased two more trucks or

tractor-trailer jobs and these, when not in use, were parked on Lot 61 or behind the loading dock that was located on the north half of Lot 63 or on the Wabash right-of-way, and sometimes on the north part of the south half of Lot 63. At the time plaintiffs purchased the property, the roadway or area traveled by the trucks in going across the north part of the south half of Lot 63 and over Lot 62 into the garage building was surfaced with rock and chat. It had some holes or depressions, and these were filled by the plaintiffs for their accommodation in getting into the garage. Plaintiffs also added more rock and chat to the surfacing and, in the latter part of 1959, they covered this area with asphalt. This gravel and asphalt extended from the doorway of the garage on Lot 3 over Lot 62 and westward over the north part of the south half of Lot 63 to the railroad right-of-way.

Numerous items were stored from time to time on Lot 61, including a 500-gallon tank, a swimming pool filter, 20-foot length sections of pipe, rolls of hose and other items, and the tractor-trailer vehicles belonging to plaintiffs were usually stored on Lot 61 when not in use. In reaching Lot 61 for this purpose, the route of travel was over Lots 63 and 62. A steel loading platform from which trucks were loaded was located on the north half of Lot 63 approximately 10 feet north of the south line of said north half. Trucks loading at this platform, especially the tractor-trailer trucks, were driven southward and eastward over Lots 63 and 62 toward Spencer Place, were then backed eastward with the rear portion extending over Lot 61 and then driven back to the north over Lot 62 and out over Lot 63 to the Wabash right-of-way. Deliveries being made by Phillips Petroleum Company and Texaco were made with the trucks or tractor-trailers using the same process in leaving the platform and turning around. Vehicles using this traveled way made a rounded turn from the railroad property reasonably close to this loading platform, sometimes

using part of the south end of the north half of Lot 63 south of the loading dock and sometimes making the turn all on the south half of Lot 63. During this period of time, no other vehicles or trucks were ever parked or left on Lots 61 or 62 other than those owned and controlled by the plaintiffs. Vehicles were not parked in that portion of Lots 63 and 62 used as a roadway, except occasionally one would be parked on Lot 62 in front of the garage entrance. In parking cars in the garage, they would be driven southward to Spencer Place and then backed the length of Lot 62 into the garage. Plaintiffs had also put chat or rock on Lot 61 all the way back to Spencer Place about 14 or 15 feet wide. They had used this property in almost the same way ever since they had been there, starting in March of 1959. The witness testified that the first time he knew that they did not own the property in question was when someone came from the General Electric Company in 1964 and told them that the company was going to fence it in for a parking lot.

The witness testified that Spencer Place was an unimproved street and at its western portion near the Wabash Railroad was grown up in trees and weeds and was not capable of being traveled by the public. Some 200 feet north of the railroad right-of-way a small creek or stream, known as the River Des Peres, crosses Spencer Place, running in a north-south direction. There is no bridge for vehicular traffic across this stream, but only a foot bridge. There were some 5 houses on Spencer Place west of this stream and east of Lot 61. During the period of time covered by the witness's testimony, any vehicles going to the residences on Spencer Place did so by traveling the Wabash Railroad right-of-way to the point near the plaintiffs' loading dock and then going eastward over the north portion of the south half of Lot 63, over the south part of Lot 62 and across the southern portion of Lot 61 into Spencer Place, then traveling eastward on Spencer Place to the residences. The witness had seen cars en-

ter and leave by this route and had observed postal vehicles with special delivery letters, police cars, fire trucks and others so use it. These vehicles traveled over a portion of the area that had been surfaced by the plaintiffs. None of the area had ever been fenced to his knowledge, and the plaintiffs had not erected any fences. This witness lived about four blocks from the property involved. Prior to March 31, 1959, he had been generally familiar with the area and had visited and spent some time next door where a boy friend lived on Lot 4 while they were both interested in Boy Scout work. However, he had not paid particular attention to the operation of the business of the Marvel Oil Company or the use made of the property until about one month before the deed on March 31, 1959. At that time, he had gone to the property with a list of the items that were being purchased by the plaintiffs, had examined them, inspected them and noted their location. A son of the then owner explained to him the operation of the business as it had been conducted by the Marvel Oil Company and instructed in the methods used to mix the oils and generally followed in the conduct of that business. The witness stated that plaintiffs continued the operation and the use of the facilities in the same manner as the former owners had done.

To establish the facts relative to the use and possession of Lot 62 and portions of Lots 63 and 61, the plaintiffs offered as a witness the Major of Police of the City of Wellston, one John Hetley. This witness testified that he had known the whole area for approximately 15 years, had made personal trips onto the property and was personally familiar with it. Spencer Place was an unimproved street and there was no means of access to it except over a foot bridge spanning the creek on the east side, which bridge would not accommodate vehicular traffic, or by driving from Etzel Avenue along the east side of the railroad right-of-way to the north part of the south half of Lot 63, thence east across Lot 63 and southeasterly across Lot 62 and possibly 61 to the point where Spencer Place was entered. There were five houses on Spencer Place on one side and three on the other, and all vehicular traffic to these houses followed this route. This had been the condition throughout his 15 years of acquaintance with the area. He pointed out on picture or photographic exhibits certain old trucks bearing the name of the Marvel Oil Company located toward the north portion of the south half of Lot 63 and said that these trucks had been in that same place for 6 or 8 years definitely that he knew of and stated that "they always did park their trucks in the back here." He said the trucks were always parked in the back when they came in at night, that this sometimes caused other vehicles to have a hard time getting through and that this continued for the entire period that he had known the area. He also pointed out on the pictorial exhibits the shed, garage or storage warehouse located on the south end of Lot 3 with doors opening out over Lot 62, and stated that it had been in that position and condition for as long as he had been going there, if not longer. He said that he had been in the area numerous times on burglaries "and so forth" on this particular piece of property itself and "there was always trucks parked behind there and in there." He also pointed out on the pictorial exhibits the traveled way across the north portion of the south half of Lot 63, then bearing to the south and turning east into Spencer Place; also that the traveled way turned to the left after going east across Lot 63 and went to the north end to the entrance to the garage or storage building or shed. These exhibits show a well-defined and traveled way in each instance. This traveled way was not one of square turns but was curved as it left the railway right-of-way across Lot 63, then was rounded, or curved, to the south as it entered and passed over Lot 62, and curved, or rounded, to the east as it crossed over a portion of Lot 61 and entered Spencer Place.

For the entire 15 years that he had been on the police force, he had visited the area frequently, both day and night, checking for city stickers and for other purposes. During all this time, trucks were parked in this area to the south of plaintiffs' buildings. On area photographs taken in 1966 after this litigation had started, the witness pointed out the same traveled way as previously described, showing the curved vehicular path over Lots 63, 62, 61 into Spencer Place and into the garage or warehouse of plaintiffs and stated that these were the same that he had been traveling for the past 15 years when he had occasion to enter Spencer Place and this was the only way he could get into the property. He stated that at the time of trial all of the houses formerly on Spencer Place had been removed and there were now no buildings or structures in that area except the buildings of the Marvel Oil Company. Trucks had been parked on the Wabash right-of-way and upon the property eastwardly from the right-of-way for 10 years or longer. As long as the witness could remember, there had been a bulk station there and this condition had existed at that location.

Plaintiffs also offered as a witness one Hiram Ball, who had lived at 6233 Spencer Place in one of the houses between the River Des Peres and the railroad tracks and had lived there from 1939 to the time three years previous to the trial, when he moved. The Marvel Oil Company was on the west side of his home with a lot between. The witness stated that he thought the Marvel Oil Company property covered from the railroad track and back to Spencer Place. This answer was stricken by the trial court and witness then said that the Marvel Oil Company used all of that property back there, the property behind the steel shed. "They used all of that" back to Spencer Place. He stated that next to his place was a lot upon which there was a small shed, being the metal building or garage located on Lot 3, and that "they used that all the way back to

Spencer." He said that the lot directly south of Lot 4, which would be Lot 61, was used for parking trucks and for the storing of drums, and that this had been done to his remembrance ever since he moved there in 1939. He stated that the next lot to the south, which would be Lot 62, was used for transferring the trucks back and forth to the garage and that it had been so used to his remembrance ever since he moved there in 1939, that a portion of this time the garage had been used by a plumbing company for the storage of items and by the Davis Hauling Company and passageway over Lot 62 into the building during their use was the same. The only way the witness had to reach his home on Spencer Place by vehicle was along the railroad tracks, around the Marvel Oil Company's loading docks, on a curve and then on back to Spencer Place. All of the residences on Spencer Place used this same method to enter and leave their properties by vehicle, and it was also used by the postmen, firemen, policemen and others. This witness also pointed out on pictorial exhibits and photographs the route used to reach his home by going from Etzel Avenue along the railroad right-of-way, curving southeastward by the Marvel Oil Company's loading docks, across the north portion of the south half of Lot 63, on across Lots 62 and 61 into Etzel Avenue. As long as the witness could remember, trucks, including those of the Marvel Oil Company, had been parked to the south of the loading docks and in the garage, after using the passageway before described to reach the garage. Trucks were also parked by the Marvel Oil Company on the lot to the north of Lot 62 where they also had drums stored. This steel garage was in the same location and condition when he moved there in 1939. Since the witness moved from the home two or three years before the trial, his house had been torn down, the area had been included in a parking lot constructed by the defendant, there are now no other houses on either side of Spencer Place to his knowledge, and all of said area is a parking lot.

The only other witness for the plaintiff was a title examiner for the American Title Company, and he undertook to explain and state the title status of part of the properties in North Cabanne Subdivision in Block G, using a plat of the area accepted by stipulation of the parties as an exhibit. He stated that the title to Lot 62 was vested in Kate Jones except for the tax deed or collector's deed hereinafter referred to. His search of the record only went back to 1945, and there was no indication as to the time or the manner in which Kate Jones acquired title. He also testified that the title to Lot 3 and the north 50 feet of Lot 63 in this block was vested in the plaintiffs, according to the record he examined, and that it was received by plaintiffs by warranty deed on March 31, 1959. As to Lot 61 and the south half of Lot 63, the witness stated that the records reveal that it was conveyed by Edna L. Brooks and her husband to Marland C. Bates and Mary Edna Bates by warranty deed April 11, 1956, and was thereafter conveyed by Bates to Robert F. Schlafly by warranty deed on May 4, 1964, and was conveyed by Schlafly to defendant General Electric Company by quitclaim deed on May 13, 1964. No witness testified as to any knowledge of Kate Jones, but each denied ever having seen or heard of her.

Numerous photographs of the area were accepted in evidence, many of which were taken in July of 1964, just before and just after the filing of the petition in this case. The most recent photographs were taken March 18, 1966 and are aerial photos showing the area. One large aerial photograph taken in 1958 was accepted in evidence. Also accepted in evidence was an aerial photograph referred to as a U. S. Government Agricultural Service Survey photograph dated September 5, 1953, and another U. S. Agricultural Service aerial photograph dated May 13, 1958. Each of these last three mentioned aerial photographs shows a roadway or passageway as described by the witnesses leaving Etzel Avenue at the east side of the railroad tracks, going southeasterly along the railroad right-of-way to the north part of the south half of Lot 63, turning easterly at that point across the north portion of the south half of Lot 63, on southeasterly along the south portion of Lot 62 and the south portion of Lot 61 to Spencer Place. From these photographs it would appear that this is a well-defined and well-traveled roadway between the points mentioned on Etzel Avenue, to Spencer Place, and the garage on Lot 3. No evidence was offered by either party to controvert that given on behalf of plaintiff as outlined above.

With the exception of the use of the traveled way by residents on Spencer Place, there was no evidence that anyone other than plaintiffs and the Marvel Oil Company had used, had possession of or controlled Lot 62 during the period from 1939 to the date of the filing of the petition. There was no evidence that any other person had exercised any control over this lot or had in any way objected to anything that the plaintiffs or their predecessors had done thereon or in connection therewith.

We have related plaintiffs' evidence somewhat in detail because it is upon this evidence that we must decide whether plaintiffs have sustained their burden of proving all of the facts necessary and essential to the establishment of a title or right by adverse possession or user.

Defendant's claim of title to Lot 62 is dependent upon title thereto having been acquired by its predecessor by purchase at a tax sale held on the 28th day of August, 1961, and the resulting tax collector's deed. Plaintiffs, by their pleadings, petition and reply, attack this deed and ask that it be declared null and void and that it be set aside. Defendant contends that plaintiffs must rely upon the strength of their own title, cannot attack the title asserted by defendant and, therefore, have no right to challenge the validity of this tax sale and the deed. Defendant also contends that the possession claimed by plaintiffs does not

meet the requirements for establishing title by adverse possession, and that even though other facts relative to possession might be considered sufficient, there is no evidence to justify tacking the possession of plaintiffs onto the prior possession of the predecessors in title to establish the required period of time.

■ The actual use or possession of any part of this property by plaintiffs dates only from the date of their purchase from the Marvel Oil Company on the 31st day of March, 1959, which by itself cannot be the basis for a title by adverse possession. They must of necessity tack their possession onto the prior possession of their predecessors in title. This defendant contends they have not done. Authorities generally hold that while it is not absolutely necessary that there be a written instrument between successive possessors in order to permit the tacking of the possession of one onto the possession of another, there must be a conveyance, or intent to convey, by the prior possessor to the subsequent possessor. Lurvey v. Burrell, Mo.Sup., 317 S.W.2d 458; 2 C.J.S. Adverse Possession page 697; Crane v. Loy, Mo.Sup., 436 S.W.2d 739; Auldridge v. Spraggin, 349 Mo. 858, 163 S.W.2d 1042. We agree with defendant that there is no evidence in this case that the alleged prior possessor, Marvel Oil Company, conveyed or in any way intended to transfer to plaintiffs any fee simple title to Lot 62. The reason for not doing so is not known. For this reason, their claim to the fee simple title by adverse possession must fail.

However, plaintiffs do not rely solely upon the establishment of title in fee simple by adverse possession to Lot 62. They allege that they and their predecessors in title have acquired a right-of-way or easement driveway over Lots 62, 61 and the south half of Lot 63 as a means of ingress and egress to the building located on Lot 3. They also allege an easement over a portion of said lots for the benefit of residents on Spencer Place and for the general public. In some respects, allegations as to plain-

tiffs' right of user are commingled with the allegations as to the rights of the residents on Spencer Place and the general public, but the allegations are sufficient to show that plaintiffs are asking for and claiming the existence of a roadway and easement for ingress and egress that is separate from and not dependent upon the public easement asserted.

■ The evidence in this case, as quoted earlier, was that from 1939, when the witness first became familiar with the property, plaintiffs and their predecessors in title had reached the garage and storage building on Lot 3 by going across the land now in question, i. e., by leaving the railroad right-of-way, traveling across the northerly portion of the south half of Lot 63, then over Lot 62 into this building. In entering the building for the storage of trucks, the entire Lot 62 was used by driving the trucks south to Spencer Place, then backing them into the building on Lot 3. This procedure was followed for some 25 years with three trucks using the traveled way described at least twice each day, once in entering at night and once in leaving in the morning. In addition, other vehicles were driven by plaintiffs and their predecessors over this route, sometimes remaining parked in the passageway to the south of the garage. The garage entrance was constructed in a manner that it could be reached only by traveling over Lot 62. Plaintiffs and their predecessors had maintained this traveled way by surfacing it with gravel, chat, and later with blacktop. They had rented a portion of the building at times to others who, of necessity, used this route. There is no evidence that their use of the land was ever questioned or interfered with until defendant asserted some right in 1964. In fact, the use of the passageway and the ground upon which travel was made was such that witnesses testified that they thought the Marvel Oil Company and plaintiffs owned the land. There is no evidence that the use was permissive by or in subordination to any other claimant. The construction of the building

in a manner to be reached only over this passageway, the maintenance of the building in this condition, and the maintenance of the roadway as described were sufficient to advise any interested parties that the use of the land was under a claim of right, open and notorious. We believe that under the testimony given there must be a finding that plaintiffs have met their burden of proving all of the elements of adverse possession and user to establish an easement, and the finding must be for plaintiffs.

 Some of the objections made by defendant as to the plaintiffs having established title by adverse possession to the fee are not valid with reference to the easement claimed. The conveyance to plaintiffs by the predecessors in title of Lot 3 and the north half of Lot 63 necessarily included the appurtenances thereto and where an easement is annexed as an appurtenance to land by an express or implied grant or reservation or by prescription, it passes with the transfer of the land, although not specifically mentioned in the transfer. 28 C.J.S. Easements pages 708 and 710. Dalton v. Johnson, supra; 17A Am.Jur., Easements, § 150, p. 754. By conveyance in this case, the plaintiffs received whatever right their predecessors in title had in the right-of-way over the adjoining property for ingress and egress purposes, and the plaintiffs' continuation of the use of that easement can be tacked onto the use previously made by the predecessors if necessary to establish the length of time required. Plaintiffs did so continue the use of the north half of Lot 63 and all of Lot 62 and extended that use over a portion of Lot 61 by backing their trucks over Lot 61 and turning them around. We do not find that this use of Lot 61 existed for a sufficient length of time to establish any easement over that lot. As to defendant's contention that the use made by plaintiffs and their predecessors was not exclusive but was enjoyed by residents of Spencer Place and others, the fact that the right-of-way traveled by plaintiffs was in fact used by other people did not preclude establishment of an easement by prescription in plaintiffs. Good authorities hold that the use may be exclusive in the required sense even though it is participated in by the owner of the servient tenement, or by owners of adjoining land. 28 C.J.S. Easements § 15, p. 658; also 17A Am.Jur., Easements § 82, p. 698. Cramer v. Jenkins, Mo.Sup., 399 S.W.2d 15; Mueller v. Larison, Mo.Sup., 355 S.W.2d 5. The case of Cramer v. Jenkins contains a sound review of the authorities and reasoning in the establishment of an easement of ingress and egress. Following the reasoning of these authorities, we find that plaintiffs' use of this right-of-way was in a well-defined location continually used by plaintiffs and their predecessors as a means of ingress and egress from 1939 to the date of the filing of the suit herein without opposition or question by anyone until defendant attempted to acquire same and enlarge their parking lot in the summer of 1964.

 Plaintiffs sought in the trial court to have a portion of this traveled way to be declared a public roadway on the theory that it had been used as a means of access to the residences on Spencer Place, had been used by those residents in coming and going to Etzel Avenue, and had been used by the public in reaching the residences on that location. The trial court found that the use of this way had not been such as to establish it as a public roadway and the defendant, having acquired title to all of "the lots to the east that would be served by the road easement the plaintiffs seek, the right of plaintiffs, alone, in this respect cannot prevail." Evidence as to use of the public way is inconclusive and incomplete and we do not find that it justifies a finding that a public way has been established. The owners of lots to the east of this area on Spencer Street may have had some rights, but since these rights have been acquired by defendant and it does not seek to assert them herein, it is not necessary to pass upon what rights the former owners might have had.

Having determined that on the date of the tax sale and on the date of the collector's deed to defendant's predecessor in title to Lot 62, plaintiffs had an easement over said lot and the adjoining portion of Lot 63, we will proceed to consider plaintiffs' right to challenge the validity of that deed and the title that defendant asserts by reason thereof.

■ From the pleadings filed and the admissions of fact made, it is determined that defendant's claim of title to Lot 62 is founded upon a collector's deed for taxes dated April 30, 1964, said deed being based upon a tax collector's sale held on August 28, 1961, the same being recorded in Book 5376, Page 431 of St. Louis County Recorder's Records. This collector's deed was made to one Lawrence T. Burg, who transferred the property to one Robert F. Schlafly, a member of the law firm representing the defendant, who was also an agent and straw party for the General Electric Company in acquiring the property. Plaintiffs attack defendant's title to Lot 62 so acquired because of alleged defects in the purported tax sale and because, as alleged by plaintiffs, the consideration paid for purported sale was "wholly, grossly, and unconscionably inadequate, and is therefore fraudulent and void." Plaintiffs claim said tax sale to be void because of the irregularities and imperfections in the sale, and in the alternate ask that it be set aside because of the inadequacy of the purchase price. We do not find in the record sufficient evidence as to the true value of Lot 62 at the time of the tax sale in August of 1961 to justify a consideration of that question, and the view we take of the irregularities in the advertisement and conduct of the sale makes consideration of this point unnecessary.

There are certain facts shown with reference to the purported tax sale and the publications of notices preceding it that merit careful study and review. The first publication was in the St. Louis Countian, dated Saturday morning, July 29, 1961.

This is headed "Notice of Tax Sale," and states "the following is a publication of lands and lots in the City of Wellston, upon which tax certificates are to be offered for sale at the north front door of the St. Louis County Court House, Monday, August 28, 1961, * * * * according to the provisions of Section 140.170 R.S.Mo. 1959, and amendments thereto." The notice continues: "The lands or lots are to be sold under the descriptions as listed and the amounts as shown due for each year represent the total amount of the taxes, interest and costs including the cost of this sale; * * *." Further, it states: "The lands to be offered are as follows:

* * * * * *

"Grover, Geo. S., Gambleton, B. B. W. Pt L 5–6, 1956 and prior, $35.42, 1957, $7.91.

Heinz, William, N. Cabanne, B. C. E½ of L 22, 1956 and prior, $38.36, 1957, $8.09.

Heinz, William, same, B. C. L 23, 1956 and prior, $44.46, 1957, $8.60.

Heinz, William, same, B. C. L 24, 1956 and prior, $44.46, 1957, $8.60.

Hepperman, Stephen S., same, B. A. All L 35 and E Pt L 34, 1956 and prior, $150.54, 1957, $24.31.

Jones, Kate No. 1, same, B G, L 62, 1956 and prior, $42.11, 1957, $8.71."

The next publication was in the same paper on Saturday, August 5, 1961, and contained the same caption. At the point pertinent to this case, the publication is as follows:

"Grover, Geo. S. Gambleton, B B, W Pt L 5–6, 1956 and prior, $35.42, 1957, $7.91.

Hepperman, Stephen S., same, B A, All L 35 and E Pt L 34, 1956 and prior $150.54, 1957, $24.31.

Jones, Kate No. 1, same, B G, L 62, 1956 and prior, $42.11, 1957, $8.71."

The next publication was in the same paper under date of August 12, 1961, with the same caption and notice preceding. At the part pertinent to this case, the publication is as follows:

"Grover, Geo. S., Gambleton, B B W Pt L 5–6, 1956 and prior, $35.42, 1957, $7.91.

Hepperman, Stephen S., same, B A, All L 35 and E Pt L 34, 1956 and prior, $150.54, 1957, $24.31.

Jones, Kate No. 1, same, B G, L 62, 1956 and prior, $42.11, 1957, $8.71."

Plaintiffs attack the sufficiency of these publications and the resulting sale and tax collector's deed. The sale was advertised and held as stated in the notice under the provisions of Section 140.170, RSMo 1959, V.A.M.S. This section provides that the collector shall cause a copy of the list of delinquent lands and lots to be printed in a newspaper of general circulation and published in the county for three consecutive weeks, one insertion weekly, before such sale, with the last insertion to be at least 15 days prior to the fourth Monday in August, the day of the sale. The section provides for the publication of the names of all record owners or the names of all owners appearing on the land tax book and that the notice state in aggregate the amount of the taxes, penalty, interest and cost due thereon, each year separately stated. It also provides that the land shall be referred to by legal subdivision and described by number, block, addition, etc. Section 140.180, RSMo 1959, V.A.M.S., provides for the use of certain abbreviations, letters, figures and characters in legal advertisements—capital L for Lot, B for Block, N for North, E for East, etc. This section provides for certain characters or words, among them "same," that may be used to denote continuation of township, range, years, tax due, etc., and that when used they shall be deemed and held to denote the same as shall stand next above in the column in which such characters or words shall be so placed. Plaintiffs point

out that the word "same" is not authorized to be used to note a continuation of a subdivision, but is only authorized to denote a continuation of township, range, years, tax due or other date. We do not consider this as vital.

■ It appears from a consideration of the newspaper publication on July 29 as submitted in evidence the use of the word "same" in the publication following Jones, Kate No. 1, would necessarily refer to the description next above that gave an identifying subdivision as the subdivision in which Lot 62, Block G was located. Following the list backward or upward, we would find that the first subdivision referred to is under the heading "Heinz, William, N. Cabanne." We believe that anyone reading or studying this tax notice would come to that conclusion and could reasonably identify and locate the property referred to following the name of Kate Jones as being in the North Cabanne Subdivision. If the following two publications had been without change, this should be held as sufficient. However, in the last two publications, August 5 and August 12, if the same procedure is followed and we look at the listings immediately preceding that in the name of Kate Jones, the first subdivision we find referred to is under the heading "Grover, George S., Gambleton," and anyone giving attention to these two publications would reasonably conclude that the lot described as being in the name of Kate Jones was actually located in the subdivision of Gambleton and could not reasonably identify said lot as being located in the subdivision of North Cabanne. We must decide the effect of the publication of one notice properly describing the property to be sold for delinquent taxes, followed by two notices that do not properly describe the property to be sold and which are insufficient to advise the public or to enable one to reasonably identify and locate the property. In its brief, the defendant gives little attention to this question but relies chiefly on its contention that the plaintiffs cannot attack the defend-

ant's tax title to Lot 62 without demonstrating a valid title through adverse possession. The tax collector's deed executed April 30, 1964 described the property as Lot 62 in Block G of North Cabanne according to the plat thereof recorded in Plat Book 4, page 88 of the St. Louis City (former County) records. Section 140.150, RSMo 1959, V.A.M.S., provides that "[n]o real property shall be sold for state, county or city taxes * * *, unless the notice of sale shall contain the names of all record owners thereof, or the names of all owners appearing on the land tax book and all other information required by law." The plaintiffs rely chiefly upon the wording · of the statute and upon Costello v. City of St. Louis, Mo.Sup., 262 S.W.2d 591. In the Costello case, notice of sale stated: "City Block 2314, E–27, W–28." The property was, in fact, the east 20 feet of Lot 27 and the west 10 feet of Lot 28 in Block 2314 in Graham's Subdivision. The collector in the deed had described it as being in Harney's Subdivision, which was also a description used in the original deed of the land purported to be conveyed. The deed was attacked as being invalid because of the imperfect descriptions and on the ground that such descriptions failed to describe the property with reasonable certainty and failed to comply with sections of the statute as herein referred to. The court there said (1. c. 594[2]): "We are mindful of the general rule that if the description is sufficiently definite and certain to enable one reasonably skilled in such matters to locate the land that it will be held to be adequate. But that rule is modified by the plain requirements of the above statutes that there be a full description by correct lot number, block and addition, and all with reasonable certainty. The description must be accurate, correct and definite even though abbreviations are authorized." It further states that " '[f]ull' as used in Section 140.030 quite obviously means complete, entire, without abatement, perfect, but allowing of course for the use of the abbreviations authorized by Section 140.180. 'Described by number, block, addition, etc.',

as required by Section 140.170, requires that the lots shall be correctly given and referred to by number, block and addition, or subdivision."

It is our conclusion that the descriptions contained in the publications under date of August 5 and August 12 were not such as to describe the property to be sold with reasonable certainty, and that one reasonably skilled in such matters would not and could not locate the lands to be sold from that description. In the last two publications the abbreviations authorized by the statute would warrant the finding that Lot 62 in Block G was being offered for sale, but applying the statute to the use of the word "same" one must believe and find that this lot was located in Gambleton and would have no reason to expect or believe that it was located in North Cabanne. Other lots in North Cabanne were advertised for sale in the same notice, and one would have no reason to suspect that this particular lot was located in the North Cabanne Subdivision from a reading of the notices of August 5 and August 12. It is true that from the first publication on July 29 one might locate the property as being in North Cabanne, but the statute requires that there shall be three notices advising of the sale. A number of pieces of property listed in the first notice are not included in later notices. No explanation is made of this, but it is reasonable to assume that the taxes had been paid on these lots or they had been withdrawn from the sale for some reason. Anyone interested in this sale or in the property to be sold would reasonably expect that the last notice published would contain a correct description of the lands remaining to be offered at the tax sale. The language used in the Costello case is most appropriate to this case when it says (1. c. 596): "In making his land delinquent list, in his notice and advertisement of sale, in his conduct of the sale, and in his preparation and execution of his certificate of purchase and his deed the Collector must strictly follow and observe the admonition of the

statutes in this summary process of taking away from the citizen the title to the latter's land. In this case the Collector did not observe the statutes. And in such cases equity will afford relief."

Plaintiffs also point out a discrepancy that they say warrants the setting aside or nullifying of this sale and the collector's deed. In the notices, it is indicated that the property is to be sold for taxes due in the year of 1956 and prior years in the total amount of $42.11 and for taxes due in 1957 of $8.71. However, the tax collector's deed states that the sale is "for the non-payment of taxes, costs and charges for the year 1958–1959–1960." Because of our view as to the insufficiency of the notices published, it is not necessary that we consider this alleged defect.

For the reasons stated above, the decree quieting title in the defendant as to Lot 62 should be reversed and remanded, with directions that the collector's deed dated April 30, 1964 and recorded May 13, 1964 in Book 5376 at page 431 be set aside and for naught held; that the decree finding that the General Electric Company, a New York corporation, is the record owner of Lot 61 be affirmed and title quieted in defendant, General Electric Company, as to Lot 61; that the title to the south half of Lot 63 be found to be in defendant, General Electric Company, subject to easement in favor of plaintiffs as herein found and determined, and title quieted as to such south half of Lot 63 in defendant, General Electric Company, subject to said easement; that finding be for the plaintiffs that plaintiffs have an easement of travel over the north 20 feet of the south half of Lot 63 and over all of Lot 62.

The judgment of the trial court, assessing the costs one-half against plaintiffs and one-half against defendant, General Electric Company, is affirmed.

SEILER, P. J., and HOLMAN, J., concur.

STORCKMAN, J., absent.