Ronald B. MILLER and Carol M. Miller, Husband and Wife, and Alonzo W. Durham and Mildred F. Durham, Husband and Wife, Respondents,

v.

Leland F. WARNER and Joyce E. Warner, Husband and Wife, Appellants.

No. 53627.

Supreme Court of Missouri,

Division No. 1.

Nov. 12, 1968.

Clerk & Ochsner, Melville A. Ochsner, St. Louis, for appellants.

McQuie & Deiter, Montgomery City, for respondents.

HIGGINS, Commissioner.

Action to establish and quiet title to real estate by adverse possession under Section 516.010, V.A.M.S.

Respondents, in a petition filed November 3, 1966, alleged adverse, open, exclusive, continuous, hostile, and notorious possession since May 4, 1940, of the disputed strip of land, and prayed that title to the strip be quieted in them. Appellants, in answer and counterclaim, denied the petition, alleged a fee simple ownership of the disputed land, and prayed for ejectment of respondents from the land and for damages for wrongful detention. Respondents' reply denied the counterclaim, and they counterclaimed alternatively for compensation for improvements made in good faith prior to notice of appellants' claim. See Rules 89.16 to 89.21, V.A.M.R. (Sections 524.160 to 524.210, V.A.M.S.) Appellants' reply denied the alternative counterclaim.

The judgment found all issues for respondents and quieted title to the disputed premises in respondents.

On August 23, 1939, Amelia Bolliger, by warranty deed from the Hagemeier heirs, acquired title to land in Warren County, Missouri, described as all that part of the Southeast Quarter and all that part of the Northeast Quarter of Section 19, Township 47 North, Range 1 West, lying south of the railroad right of way except about 32 acres previously deeded to the railroad.

On May 4, 1940, Amelia Bolliger deeded the north part of her above property to Oscar W. and Marjorie W. Loddeke by deed which described the land conveyed as the Northeast Quarter of the Southeast Quarter and all that part of the Southeast Quarter of the Northeast Quarter lying south of the railroad, all in Section 19, Township 47, Range 1 West, containing 50 acres more or less.

On December 29, 1951, through subsequent conveyances, respondents Alonzo W. and Mildred F. Durham acquired title to the north tract; and on April 14, 1962, they conveyed to respondents Ronald B. and Carol M. Miller a part of the tract described as one acre in the Southeast corner of the Northeast Quarter of the Southeast Quarter of Section 19, Township 47 North, Range 1 West, and more particularly described by metes and bounds. The Millers are the son-in-law and daughter of the Durhams. In 1963 they began construction of a dwelling house on the 1-acre tract and, in April, 1964, they moved into their new home. Respondents thought the dwelling was being erected on land conveyed to the Millers by the Durhams but it is on the disputed strip of land.

On August 18, 1942, Amelia Bolliger deeded the south part of her property, acquired from the Hagemeier heirs, to Huston J. and Gladys Martin by deed which described the land conveyed as the South half of the Southeast Quarter of Section 19, Township 47, Range 1 West, containing 80 acres more or less.

On August 19, 1961, through subsequent conveyances, including passage through A. L. and Gertrude Goddard, appellants acquired title to the south tract. Appellants subsequently conveyed 61.40 acres in the south part of their tract, but retained the land immediately south of that held by respondents, and respondents' south line is a common boundary with the north line of appellants' remaining property.

At all times since the Hagemeier ownership of the combined tracts there was an east-west fence consisting of woven wire and two or three strands of barbed wire supported by wooden posts. The fence still exists at its original location and extends from Route H on the east to the west line of respondents' property. It is straight except for a "jog" 14 feet to the north at a point 908.90 feet west of Route H and is the south line of the disputed area which is bordered on the east by Route H and on the west by a north-south fence enclosing a railroad lake. There are no physical monuments at the north line of the disputed area, but the area is established to be 143 feet wide, north and south, at the east line and 110 feet wide on the west.

The Durhams never suspected that their deed of December 29, 1951, did not convey title to them to all property north of the fence, and all respondents' first knowledge of appellants' claim followed survey work begun for appellants in 1966, prior to this lawsuit. (The survey was not completed until May, 1967.) Respondents believed that they had title to all land north of the fence. They did not, therefore, tell anyone of their claim but, since 1951, they claimed the disputed area. "We had possession of it and we claimed it as ours."

Approximately the east 300 feet of the disputed strip has been cleared since 1951. West of that 300 feet, the strip, in 1951 and until October, 1957, contained "weed trees and sassafras and elms and a couple of sycamores and a couple of cedars and things like that. There were no trees that had any value to them." The growth was irregular on its north line and varied in width from 100 feet, north and south, at some points, to 25 feet at others. There were some open spaces in the growth but the area was not open for cultivation beyond the north line of growth until the area was finally cleared in October, 1957.

Since the May 4, 1940, conveyance by Amelia Bolliger to the Loddekes, respondents' predecessors in title used and occupied the land north of the fence; none of the owners of the south tract used or occupied

any land north of the fence except as tenants of respondents or their predecessors.

Soon after their purchase in December, 1951, the Durhams began clearing the disputed area of its brush and growth. They worked first by hand and, later, from 1954 until 1957, with a tractor. In October, 1957, they hired a bulldozer and operator to complete the clearing. Between 1952 and 1957 respondents worked at clearing the strip "practically every week." The timber and brush was not sold or used for logs, bolts, or firewood. It had no value; "* * * just used the poles to put in ditches to help stop them up."

In 1952, the Durhams sold an alfalfa hay crop on the east 300 feet of the disputed strip to Frank Stuermann. In 1952, Mr. Stuermann, for cash rental paid to the Durhams, pastured cattle on the westernmost part of the disputed area. The pasture included land extending north along and east of the west fence and down to the south fence. From 1954 through 1961, Mr. Stuermann farmed portions of the disputed area under sharecrop agreements with the Durhams. Prior to 1958, the east 300 feet was clear and was cultivated as close as possible to the brush and timber north of the south fence. Beginning in 1958, after the clearing was completed, the entire area was cultivated as close to the fence as possible by Mr. Stuermann under sharecrop agreements with the Durhams. In 1962, appellant Warner "put in a bean crop on shares" on the disputed land north of the fence.

Clearing and cultivating of the disputed area were done in open view of persons passing on the roadway adjacent to the area and to those farming land south of the fence. Mr. Goddard, owner of the land south of the fence from 1945 to 1961, talked to Mr. Durham across the fence on at least one occasion when Mr. Durham was engaged in clearing the disputed area.

Although the Durhams were on their farm every week since their purchase in 1951, they did not live there. Their farm-house was occupied only on some weekends. The Millers have lived at all times on their premises since construction of their home in 1964.

Appellants contend that respondents' evidence failed to prove the elements of an adverse possession of the disputed property; that "pasturing of cattle or cutting of timber under the circumstances * * * are not sufficient to establish adverse possession"; that the 10-year statute of limitations could not have started to run until October 3, 1957, and thus the suit filed November 3, 1966, was premature; that "exercise of control over the east 300 feet would not have been an exercise of control on the remaining acreage to the west."

■ To accomplish an effective adverse possession, the possession must be hostile and under claim of right, actual, open and notorious, exclusive, and continuous; and the burden of proving these five elements and their concurrent existence for ten years prior to commencement of the action to perfect title is on the party claiming title by adverse possession. Moss v. James, Mo., 411 S.W.2d 104, 106 [1, 2]; Section 516.010, V.A.M.S. See also Horton v. Gentry, 357 Mo. 694, 210 S.W.2d 72, 75 [2]; Brown v. Chapman, Mo., 163 S.W.2d 920, 922 [3]; 2 C.J.S. Adverse Possession § 8. "The term, adverse possession, designates 'a possession in opposition to the true title and real owner, and it implies that it commenced in wrong, by ouster or disseisin, and is maintained against right. The law, on the contrary, presumes that every possession is rightful, and consistent with, not in opposition or "adverse" to, title and ownership. A party, therefore, who relies upon "adverse possession," in order to rebut this presumption of possession consistent with the title of the real owner, must prove his possession to be "adverse" to the title set up * * *; that is, he must show the actual knowledge of the real owner that he claims in opposition and defiance of his title, or he must show such an occupancy and user, so open and notorious and inconsistent with, as

well as injurious to, the rights of the true owner, that the law will authorize, from such facts, the presumption of such knowledge by the true owner. It is not the mere occupancy or possession which must be known to the true owner to prejudice his rights, but its "adverse" character.'" Hilgert v. Werner, 346 Mo. 1171, 145 S.W.2d 359, 361 [3, 4].

Was respondents' claim hostile under claim of right?

■ Tillman v. Hutcherson, 348 Mo. 473, 154 S.W.2d 104, 109 [9, 10], considered this element of adverse possession: " * * * if either owner claimed to the fence unconditionally his possession was adverse, regardless of his reason, so long as it was actual, open, notorious, exclusive, continuous and under hostile claim of *ownership*, not necessarily claim of *right* in the sense of moral right, or even prior legal right. In fact the term 'adverse possession' implies a commencement in *wrong* against right by ouster. * * * Even a tortious possession by trespass may ripen into a title by adverse possession. The claim of ownership may be only 'pretended' or 'asserted.' * * * Neither was it necessary that * * * claim be 'independent of the fence.' Color of title is not necessary under the ten-year statute of limitations." Under this authority, in absence of record title and without knowledge prior to 1966 that their deed did not describe all the land north of the east-west fence, respondents' unconditional claim of ownership of land to the fence as evidenced by occupation, clearing, farming, pasturing, and erecting improvements on the disputed area constitutes hostile possession under claim of right in the sense of "pretended" or "asserted" ownership.

State ex rel. Edie v. Shain, 348 Mo. 119, 152 S.W.2d 174, presented the same question. Defendants' predecessor had erected a building which encroached on plaintiff's property for more than ten years prior to plaintiff's suit in ejectment. Defendants did not know of the encroachment until just before suit was filed and evidence showed that had defendants' predecessor known of the encroachment he would have paid for the land occupied. The defense was adverse possession. The question: Where one landowner occupies land of an adjoining owner in ignorance that he is so *doing and in ignorance of the boundary* line, can his possession be considered hostile and adverse? The answer: "If the possessor occupies the land in question intending to occupy that particular piece as his own, his occupancy is adverse. It is not necessary that he intend to take away from the true owner something which he knows belongs to another, or even that he be indifferent as to the facts of the legal title. It is the intent to possess, and not the intent to take irrespective of his right, which governs." 152 S.W.2d 1. c. 176 [5–8]. Respondents' "intent to possess" in this context is demonstrated by the evidence in the statement and by additional testimony. When Mr. Durham hired the bulldozer to finish clearing the timber from the disputed strip he felt that he owned the land because he had possession of it; and during her cross-examination Mrs. Durham testified that they were on the disputed land through the years under assumption they owned it. "We had possession of it and we claimed it as ours. * * * We didn't think anyone else owned it but us."

Was respondents' claim actual and for more than ten years?

■ "Possession is a legal concept. It involves two things: A present or, in the case of constructive possession, a past ability to control the thing possessed plus an intent to exclude others from such control," State v. Shain, supra, 152 S.W. 2d 1. c. 177 [5–8], and "Actuality of possession, and the intent with which dominion over land is exercised, may be shown by an almost endless combination of circumstances * * *. Ordinarily each case must be ruled on its own facts, * * *." Tillman v. Hutcherson, supra, 154 S.W.2d 106 [1, 2]. The disputed land claimed by adverse possession by respondents is the

south portion of an enclosed 50-acre tract. No monuments or physical barriers mark or divide the disputed strip from the remainder of respondents' land to the north but the fence does separate it from appellants' land south of the fence. The disputed strip is not distinguished from the remainder of respondents' enclosure, a situation existent since the commencement of respondents' occupation in 1951. Portions of the strip have been farmed by respondents or by tenants, including appellants, under them. As early as 1952, respondents sold hay from the disputed area and accepted rent for pasturage. From 1952 until 1957, respondents worked at clearing the area, first by hand, then by tractor, and, finally, by bulldozer. None of this was contradicted and, under the circumstances, warranted a finding of 10-years' actual possession. True, pasturing cattle or cutting timber do not in themselves establish adverse possession, Horton v. Gentry, supra, 210 S.W. 2d l. c. 75 [3], Pharis v. Jones, 122 Mo. 125, 26 S.W. 1032, 1034 [3], Crider v. Meatte, 320 Mo. 474, 7 S.W.2d 691, 695 [14–16], but they do tend to show claim of ownership, Horton v. Gentry, supra, and, in these circumstances, combine with others to support the court's finding. Nor are these circumstances the "occasional trespass" for purposes of taking firewood or rock held not to constitute possession in Herbst v. Merrifield, 133 Mo. 267, 34 S.W. 571, 572, and Conran v. Girvin, Mo., 341 S.W.2d 75, 90 [17].

■ Appellants' kindred contention that respondents' suit and claim were premature and could not encompass more than the east 300 feet is bottomed on an argument that Mr. Durham could not have possessed "up to the fence" on that part of the disputed area west of the east 300 feet prior to October 3, 1957, because it was only then that the fence line was finally cleared. This argument overlooks the uncontradicted evidence of respondents' intent to possess all within their enclosure, and their possession of the east 300 feet of the strip coupled with the continuously recurring acts of clearing, farming, renting, and cultivation as far as machinery could go, all of which gave ample support to a finding of their possession to the fence. For similar cases sustaining occupancy of a part as possession of all of a claimed tract, see Landers v. Thompson, 356 Mo. 1169, 205 S.W.2d 544; Lossing v. Shull, 351 Mo. 342, 173 S.W.2d 1; Moss v. James, supra. See also Barker v. Allen, Mo., 273 S.W.2d 191, 194–195 [4, 5]; Mooney v. Canter, Mo., 311 S.W.2d 1, 5 [1].

■ Was the claim open and notorious? Uncontradicted evidence showed that respondents' efforts to clear the disputed area and their tenants' (including Mr. Warner) farming of the area took place in daylight in open view of travelers on the adjacent state highway and to those farming the tract south of the fence. This was sufficient to support the finding in favor of respondents on this issue.

■ Was the possession exclusive? Again, uncontradicted evidence places respondents in exclusive possession of the strip since 1951. No other person occupied the strip except with respondents' permission and no possessor from south of the fence ever used or occupied land north of the fence except Mr. Warner who did so only as a share-tenant of respondents in a bean crop.

■ Was possession continuous? Following their purchase in 1951 respondents were on their land every week. They stayed there some weekends. Their acts of ownership, farming, clearing, selling hay, renting pasturage, were continuously recurring acts. They in no way interrupted or abandoned their occupancy and no evidence was shown to contradict their continuous possession of their enclosure.

Under this evidence the court's finding in favor of respondents on each of the issues was reasonable. Landers v. Thompson, supra, 205 S.W.2d l. c. 546 [4–6].

Judgment affirmed.

HOUSER, C., not participating.

WELBORN, C., concurs.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All of the Judges concur.