George E. MORAN and E. P. Moran, his wife, (Plaintiffs) Respondents,

v.

The Unknown Officers, Stockholders, Trustees, Directors, Grantees, or Successors of ROARING RIVER DEVELOPMENT COMPANY, a Corporation, et al., (Defendants) Respondents,

State of Missouri ex rel. John C. Danforth, Attorney General of Missouri, Intervenor-Appellant.

Nos. 54550–54553.

Supreme Court of Missouri, Division No. 1.

Dec. 14, 1970.

Motion for Rehearing or to Transfer to Court En Banc Denied Jan. 11, 1971.

Royle Ellis, Cassville, for respondents.

John C. Danforth, Atty. Gen., Louren R. Wood, Asst. Atty. Gen., Jefferson City, for appellant.

JOHN R. RICKHOFF, Special Judge.

This appeal involves four separate suits to quiet title to land aggregating 100 acres and located in Barry County. By stipulation of the parties the testimony and evidence in all of the causes were considered part of the testimony and evidence in each of the cases. Title to real estate is involved, vesting this court with jurisdiction of the appeal. Krumm v. Streiler, Mo., 313 S.W.2d 680.

The land which is the subject of the litigation consists of three contiguous tracts, all lying in section 27, township 22, range 27. The three tracts had been platted by the Roaring River Development Company in 1924 as the First Addition (20 acres), Second Addition (40 acres), and Fourth Addition (40 acres). Three tracts lie in a row, extending in an east-west direction. The First Addition is the most easterly tract, the Second Addition is immediately west of and contiguous with the First Addition. The First Addition was divided into 312 lots, each 25 feet by 100 feet. The Second and Fourth Additions were each divided into 624 lots of the same size as those in the First Addition. On January 1, 1933, the charter of Roaring River Development Co. was forfeited for

failure to file an annual registration report and antitrust affidavit.

The parcel consisting of the three tracts is adjoined on the west, south, and east by Roaring River State Park. The Second Addition and Fourth Addition are divided by state highway 112, which extends in a generally north-south direction, so that the Fourth Addition for the most part lies west of the highway and the Second Addition east of the highway. The highway is not straight, however, and parts of certain lots of the Fourth Addition are on the east side of the highway and certain of the lots and parts of lots of the Second Addition are on the west side of the highway. Other lots and parts of lots which were originally platted in these two Additions are now part of highway 112.

For convenience of reference, the separate suits will be referred to by the names of the respective plaintiffs.

The Moran suit claimed title to the Second Addition (except lots 138 through 153, lots 160 through 175, lots 191 through 206, lots 209 through 217, lots 252 through 268, lots 304 through 312, and lots 414, 431, 571 and 591) and also to the First Addition (except lots 139 and 287).

The Gibbons suit claimed title to lots 209 through 217, 252 through 268, and 304 through 312 of the Second Addition, and all that part of lots 322 through 334 of the Fourth Addition which lie east of highway 112.

The Wilhelm suit claimed title to all of the Fourth Addition except the parts of the lots of the Fourth Addition claimed by Gibbons (being those parts which lie east of highway 112) and except right-of-way for highway 112.

The Hailey suit claimed title to lots 138 through 153, 160 through 175, and 191 through 206 of the Second Addition.

The claims in all of the petitions were based upon actual, adverse, open, peaceable, notorious, continuous, hostile, exclusive possession of said lands for more than ten years next last past, under color of title.

Ray W. Thompson was a defendant in each of the four suits and in each of the suits filed an answer denying that the plaintiffs were the owners of the land described in their respective petitions and asserting that he, Ray W. Thompson, was the owner of the respectively described tracts. Before the close of the plaintiffs' testimony in the first case to be tried this defendant withdrew from participation in all of the cases and consented to entry of a decree in accordance with the evidence found by the court.

Rufus Miller, also a defendant in the Wilhelm suit, filed an answer denying that plaintiff was the owner of lots 27 through 55 and lots 339 through 364 of the Fourth Addition and asserting that the defendant Miller was the owner in fee simple of those lots.

The State of Missouri filed its affidavit and motion to intervene in each of the four cases, which motion was sustained in each instance. In each case the intervenor filed an answer denying that the plaintiffs were the owners of the land described in their respective petitions and asserting that intervenor was the owner in fee simple of the described properties.

In each of the cases an attorney was appointed to act for the unknown defendants, and in each of the cases he filed an answer averring that he did not have sufficient information, knowledge or belief to admit or deny the allegations in the plaintiffs' respective petitions and asking that the court require strict proof thereof.

The four cases were tried by the trial court sitting without a jury.

George Moran and his wife, plaintiffs in the Moran suit, base their claim of color of title on three quitclaim deeds. The first deed, dated June 14, 1939, is from one Arthur Henbest, and describes the north one-third of the Second Addition

(lots 1 through 104 and 313 through 416) and the north half of lot 110, excepting any lots on the west side of state highway 112, and lots taken for highway 112, and lots on which taxes had been paid since 1935. This deed was not recorded until September 8, 1954. In 1940 Moran contracted with Arthur Henbest to buy the remainder of the Second Addition and the entire Fourth Addition. A quitclaim deed from Henbest to Moran was dated March 30, 1944, and recorded October 2, 1945, and described the Second Addition along with the Fourth Addition (except lots 261 through 268, 304 through 312, and 240 through 254) except lots taken for highway 112 and lots on which taxes had been paid since 1935. As will appear from facts related below, Arthur Henbest had already in 1941 conveyed lots 209 through 217 and 252 through 260 of the Second Addition to one F. S. Moore. The third quitclaim deed was from one Ray M. Bruner and was dated January 13, 1950, and recorded September 8, 1954. This deed described the entire First, Second and Fourth Additions.

George Moran testified that he and his wife, with their two young daughters, moved to Barry County July 1, 1936. During the next three years they lived at four different locations, and during at least the latter part of that time they operated a novelty shop near Roaring River State Park. Prior to July 1, 1939, they paid Arthur Henbest $250.00 for the first of the quitclaim deeds above mentioned, and on July 1 moved to the property described in that deed. The novelty shop, which was a building approximately 12 feet by 18 feet, was taken down in two sections and moved by truck to the property bought from Arthur Henbest, where it was erected about 40 feet east of highway 112. The novelty shop was converted into a two-room home and thereafter improved from time to time. Electricity was installed in August 1939, another room was added in 1941, and a fourth room added in 1943. At the time of the trial the house consisted of four rooms with a glassed-in porch.

During the ensuing years the Morans made other improvements on the land. A driveway was built from the house to highway 112. Chicken houses, livestock sheds, hog sheds, and smokehouses were built on the east side of the highway. The Morans also built a one-room cabin, about 10 feet by 12 feet, which they rented. From 1939 until 1960 the Morans had a fruit stand and sold novelties on the property, and in 1960 erected a steel and glass building from which they sold novelties and antiques. This building was located south of their home and about 50 feet east of the highway. In 1945 the Morans had a deep well drilled about 30 feet south of their house. In 1954 a pump was installed in the well but failed to operate and in 1956 the Morans had the well drilled deeper.

At the time the Morans first moved to the property which is the subject of this suit, there was already in existence a fence along the line between the south boundary of the Second Addition and the First Addition and the north boundary of Roaring River State Park, and also along the entire east boundary of the First Addition. In 1943 the Morans built a fence along the east side of highway 112 from the State Park fence on the south to the north line of the Second Addition, thence along the north line of the Second and First Additions to the northeast corner of the First Addition, where it connected with the State Park fence running along the east line of the First Addition. The result was that the entire First and Second Additions were fenced, partly by the pre-existing State Park fence and partly by the fence built by the Morans.

On the property east of the highway, Mr. Moran testified that he kept, from time to time, cows, hogs, a horse, chickens, guineas, ducks and geese. Approximately two acres on the east side of the highway were cleared in 1940 for a truck garden. The Morans also cut stovewood, sawlogs, and fence posts off the land and sold some of them. They also cleaned up about 15 acres of the land in a strip along the east

side of the highway, from the south boundary to the north line of the Second Addition.

In 1940 the Morans contracted to buy from Arthur Henbest the land described in the second quitclaim deed earlier mentioned herein. The consideration, $275.00, was not paid until 1944, at which time the deed was executed and delivered. In the meantime, in 1943, the Morans built a fence along the north boundary of the Fourth Addition, and along a bluff on the west side of this Addition, which Mr. Moran estimated averaged approximately 100 feet east of the west line of the Addition. The south side of the Fourth Addition was already fenced by a fence along the north boundary of Roaring River State Park. A fence along the west side of highway 112 had been built in 1936 and the Morans did not rebuild this fence.

The Morans kept cattle and hogs on the land west of the highway from 1943 to 1959. They also cut logs, fence posts, and barrel staves from the timber on that side of the highway, as well as from all of the land east of the highway. On the west side of the highway a hay barn was built and two to two-and-one-half acres cleared for a garden.

In 1950 the Morans acquired the third quitclaim deed from Ray M. Bruner, for which the Morans paid him $375.00. Prior to that time, however, the First Addition had been fenced and the Morans had pastured cattle on it and cut timber off it.

The Morans lived on the property from 1939 until 1961. During that period Mr. Moran from time to time worked in other areas and was absent from the property for extended periods. He testified that during all of those periods either his family or a tenant of his Sam Holt, was actually living on the property. In 1961 the Morans moved to Seligman, and for a short time their oldest son and his wife lived on the property. The property was then rented to one John Rife, and thereafter to I. T.

Stone who was still living there at the time of the trial. Mr. Stone paid rent to the Morans until January 1968 and thereafter refused to pay any further rent.

The land comprising the additions having been platted, it was assessed as lots. Mr. Moran testified that he did not have the funds to pay the taxes based on the assessment as lots, and that he had on different occasions attempted to have the property assessed as acreage, but without success. He therefore paid no taxes on the land.

Jeff Hawk testified he had been acquainted with the Morans approximately 30 years. He corroborated Mr. Moran's testimony with respect to their residence on the property, that it was fenced, partially cleared, timber cut, the house expanded and a well drilled. He also testified to the Morans having kept hogs and chickens on the land.

Mae Ward testified she lived near the Morans and for a period of time bought milk, eggs, and wood from them. She testified the Morans erected farm buildings on the west side of highway 112, had fenced the property, kept a cow, chickens, and hogs on the west side of the highway. She had also purchased garden produce from the Morans which she testified had been grown on both sides of the highway.

Clyde Holt testified that he and his father, Sam Holt, had lived on the property between 1940 and 1945, some of the time when Mr. Moran was away working. He corroborated the testimony of prior witnesses with respect to fencing the land, cultivating parts of it, cutting wood, keeping livestock and drilling a well. Further corroboration was provided by the testimony of George H. Moran, son of the plaintiffs, and by Roger Davis.

The land claimed by Jack Gibbons was conveyed to him by quitclaim deed dated September 4, 1954, wherein "Gertie Moore, single" was the grantor. This deed was recorded September 7, 1954. Part of the lots (209 through 217 and 252 through 260)

claimed by Mr. Gibbons had been conveyed to F. S. Moore by Arthur Henbest and wife by quitclaim deed dated August 19, 1941, and recorded on that same day. By quitclaim deed dated August 3, 1943, the daughters of Gertie Moore, Bertha Hoog and Ethelen Kisler, and their respective husbands, conveyed to Gertie Moore lots 209 through 217, 252 through 268, and 304 through 312 of the Second Addition, and all that part of lots 322 through 334 in the Fourth Addition lying east of state highway 112. This was the same land subsequently conveyed by Gertie Moore to Jack Gibbons and which is claimed by him in this suit. It may be inferred from the testimony of Jack Gibbons that F. S. Moore had died sometime prior to September 1954, probably prior to August 1943; that Gertie Moore was his widow, although the fact and date of the death of F. S. Moore is not explicitly stated in the testimony.

Jack Gibbons testified that Mr. Moore had planted an orchard on the land, cut some brush, and cleaned up the land. After the conveyance to Mr. Gibbons he cleaned up brush, mowed part of it, and had 1,500 pine trees set out on the land. For several years Mr. Gibbons maintained a sign on the property advertising a motel he owned and also permitted individuals to maintain a stand on the property to sell artifacts and trinkets and to sell pony rides. Mr. Gibbons paid taxes on the land since 1954.

Exhibit G, introduced by the State is a strip map of that portion of state highway 112 which runs through the Second and Fourth Additions. From this map it appears that no part of lots 322 through 334 of the Fourth Addition lie east of the highway. It also appears that the east line of the highway runs through lots 210, 211, 259, 260, and 261 of the Second Addition. Lot 209 of the Second Addition lies wholly within the highway right-of-way.

By warranty deed dated April 27, 1955, George E. Moran and wife conveyed to W. C. Hailey and wife lots 138 through 153, 160 through 175, and 191 through 206, all in the Second Addition. This deed was recorded April 30, 1955. Mr. Hailey paid the taxes on these lots for the years 1962 through 1967. Mr. Hailey did not testify in the trial of the case, but George E. Moran testified that he had sold the above enumerated lots to him, that Mr. Hailey had left the lots in the possession of the grantor (Moran) to take care of for him.

By warranty deed dated October 16, 1959, and recorded September 14, 1966, George E. Moran and his wife conveyed to Milt Wilhelm all that part of the Fourth Addition "lying west of the Highway." Exhibit G above mentioned shows the west line of highway 112 running diagonally from northeast to southwest through lots 321 to 338, inclusive, of the Fourth Addition, so that the eastern part of these lots are within highway 112. This deed also described that part of the Second Addition lying west of highway 112, but these lots, which are lot 1 and parts of lots 2, 52, 53, 104, 105, 156, and 157 were not claimed by Wilhelm in his petition. The consideration for the deed was the agreement of Mr. Wilhelm to quiet title to the Moran land. The property was never assessed to Mr. Wilhelm and he never paid taxes on it.

By quitclaim deed dated August 19, 1959, one George E. Antle conveyed to Rufus Miller and wife, defendants in the Wilhelm suit, all of lots 27 through 55 and lots 339 through 364 of the Fourth Addition. This deed was recorded August 20, 1959. Mr. Miller testified that he paid the taxes on these lots for 1958 and subsequent years. He also testified that he had never fenced this property, cut any timber on it, cultivated it or improved it.

Don Reed, the superintendent of Roaring River State Park since 1956, testified on behalf of the intervenor. He stated the Park Department had occasionally used an old logging road across the First Addition to get to the park's radio antenna. The only fencing he had observed was a little piece along the highway

and two or three pieces of barbed wire attached to a tree. The boundary between the Park and the First Addition, Mr. Reed testified, is on a bluff. He said there was no discernible boundary line on the north side of the First, Second, or Fourth Additions. The only fence he had observed in the Fourth Addition was a portion along the highway, which he said was "all down" and had been for a long time. He testified to a clearing in the area claimed by Jack Gibbons and to a tomato patch cleared by Mr. Stone, George E. Moran's tenant.

On October 21, 1959, Bill Henbest, a son of Arthur Henbest, executed a quitclaim deed conveying to Donald Reed lots 1 through 312 of the First Addition, excepting lots 139, 231, and 287; all of the Second Addition, except lots 1, 5, 48, 52, 53, 57, 98, 99, 100, 104, 105, 109, 110, 111, 150, 151, 156, 157, 162, 163, 204, 206, 208, 209, 211, 212, 213, 256, 260, 262, 263, 264, 265, 308 through 312, 414, 571, and 591; and all of the Fourth Addition except lots 1 through 55, 313, 315, 317 through 328, 311, 333, 335, 337 through 364, and 425. The deed also described other property not involved in these suits. This deed was recorded October 21, 1959; and by quitclaim deed dated and recorded October 26, 1959, Donald Reed conveyed the same property to the State Park Board. Mr. Reed testified that the State Park Board had not attempted to make any use of the property described in these deeds.

The intervenor introduced into evidence a number of deeds dated and recorded at various times in 1931 conveying to the State certain of the lots in the Additions involved in this litigation. In the First Addition, these were lots 85, 144, 137, 143, 193, 207, 43, 178, 123, 129, and 84; and in the Second Addition, lot 15.

There was also introduced into evidence a survey showing a fence maintained by the State Park north of and roughly parallel with, but at a slight angle to the south line of the First, Second, and Fourth Additions. At the west end this fence is 46 feet north of the south line of the Fourth Addition, and it extends southeasterly until it crosses the south line of the First Addition slightly more than 3,000 feet east of the southwest corner of the Fourth Addition. The existence of this fence appeared also from the testimony of witnesses.

The trial court decreed fee simple title in the State of Missouri to the lots described in the deeds executed in 1931 and to the land lying south of the State Park fence shown on the survey introduced into evidence. None of the parties contended that anyone could acquire title by adverse possession against the State.

In the Moran case the plaintiffs were decreed owners in fee simple of the Second Addition, except lots 138 through 153, 160 through 175, 191 through 206, 209 through 217, 252 through 268, 304 through 312, and lots 414, 434, 571, 591, and 15. These lots coincided with those of the Second Addition claimed in the Moran petition, with two exceptions. Lot 15, claimed by the Morans, is described in one of the 1931 deeds to the State. The Moran petition did not claim lot 431, but it was nevertheless awarded to these plaintiffs. On the other hand, the plaintiffs did claim lot 434, but it was excepted from the lots awarded these plaintiffs and was not awarded to any other party in this litigation. Lots 207 and 208 of the Second Addition lie wholly within highway 112. The decree also awarded the Morans all of the First Addition except lots 43, 84, 85, 123, 129, 137, 139, 143, 144, 178, 193, 207, and 287. The Moran petition had not claimed two of these excepted lots, and the others were conveyed by the 1931 deeds to the State.

In the Wilhelm case the trial court decreed fee simple title in the plaintiffs to that part of the Fourth Addition claimed by them in their petition, with the exception of lots 27 through 55 and 339 through 364. These lots the court decreed to be

owned by various named individuals, including Rufus Miller and his wife.

Jack Gibbons and the Haileys were decreed to be the owners of all of the lots and parts of lots claimed in their respective petitions.

Intervenor, the State Park Board, appealed from the judgments of the trial court in favor of each of the plaintiffs and in favor of the defendant Rufus Miller, but thereafter dismissed its appeal as to the judgment in favor of Miller. None of the other parties appealed from the judgment in favor of Miller or of the other defendants, and we do not consider the propriety of the judgments in favor of them.

Since all of the cases were tried before the court without a jury we must review them upon both the law and the evidence as in suits of an equitable nature. However, we do not set aside the judgment of the trial court unless it is clearly erroneous; and, in so determining we must give due regard to the opportunity of the trial court to judge of the credibility of the witnesses. Supreme Court Rule 73.01(d), V.A.M.R.; Krumm v. Streiler, supra.

The intervenor contends that the evidence is insufficient to sustain the trial court's judgment in favor of the plaintiffs in the four cases. Appellant agrees that the Morans obtained title to at least part of the tracts by adverse possession, but asserts that their possession did not extend to all of the land to which they were awarded title for the reason that the Morans did not have actual possession of the entire tract and the defect was not cured by color of title in them. Intervenor further contends that inasmuch as Wilhelm and Hailey claim under the Morans, failure of the Moran title destroys the claims of the plaintiffs in those two cases. Intervenor's contention with respect to the Gibbons claim (which does not rest on the Moran title) is not clear, but apparently is based on the theory that

the evidence does not show any possession in him for the required ten-year period.

■ As this court recently stated in Beldner v. General Electric Company, Mo., 451 S.W.2d 65, 67: "The law with reference to establishing title by adverse possession has been often considered and the rules well defined. In order to establish title by adverse possession, plaintiffs had the burden of proving that they and those under whom they claim had possession of the land so claimed for the statutory period (10 years) and that such possession was actual, hostile, under claim of right, open and notorious, exclusive and continuous for the whole prescribed period of time." We add, however, that the application of this rule is subject to the provisions of § 516.040 RSMo 1969, V.A. M.S., which provides that possession, under color of title, of a part of a tract of land, in the name of the whole tract claimed, and exercising, during the time of such possession, the usual acts of ownership over the whole tract so claimed, shall be deemed a possession of the whole of such tract. This statute has been interpreted to extend actual possession of a portion of a tract of land to a constructive possession of the entire tract as described in the instrument which provides the basis for color of title. Hamburg Realty Co. v. Woods, Mo.Sup., 327 S.W. 2d 138. And this court has held that "less weight of evidence" is required to support an adverse entry by one with color of title than "a bare entry by an intruder under no claim of right." Feinstein v. McGuire, Mo.Sup., 297 S.W.2d 513, 517.

■ As we have hereinbefore recited, George Moran and his wife acquired three quitclaim deeds describing, in the aggregate, all of the land decreed by the trial court to be vested in the Morans and their successors in title. The deeds were dated, respectively, in 1939, 1944, and 1950. It is irrelevant to the issues in this case that none of these deeds may have conveyed good title. "Although the instrument

under which color of title is claimed may be actually void and convey no title, if it purports on its face to convey the title to the land in question by appropriate words of transfer it will constitute color of title." Jamison v. Wells, Mo.Sup., 7 S.W.2d 347, 348; Barker v. Hayes, 347 Mo. 265, 147 S.W.2d 429; Johnson v. Moore, 346 Mo. 854, 143 S.W.2d 254; Land Clearance for Redevelopment Auth. v. Zitco, Mo.Sup., 386 S.W.2d 69.

Intervenor does not contest the foregoing proposition, but maintains that the deeds have no validity as color of title because of the delay in recordation (the 1944 deed was recorded in October 1945, and the other two deeds were recorded in September 1954), and further because the 1950 quitclaim deed purported to convey the same property described in the two prior quitclaim deeds.

■ The second part of intervenor's contention is easily disposed of. As early as 1891 this court stated that the proposition that a party in possession of land may fortify his right thereto by acquiring any outstanding interest therein without thereby weakening the force or effect of his possession was too well settled in this state to require further comment. Mather v. Walsh, 107 Mo. 121, 17 S.W. 755; see also Feinstein v. McGuire, supra; Dalton v. Johnson, Mo.Sup., 320 S.W.2d 569.

Intervenor does not cite, nor do we find, any cases in which the effect of delay in recordation (or failure to record) upon the issue of color of title was raised or decided. In Land Clearance Auth. v. Zitco, supra, 386 S.W.2d 1. c. 82, the court stated that "the execution and recording of the deed in 1950 constituted 'color of title'" but the question of what result would have followed a failure to record the deed was not in the case and was not discussed. On the other hand, apparently distinguishing between a recorded title and color of title, this court, in Hamburg Realty Co. v. Woods, supra, 327 S.W.2d 1. c. 154, stated: "Defendants had no record (or even color-

able) title to any of the lands on either side of the 194.15 acre tract."

We do not find in the reported cases any precise definition of the term "color of title", each case being decided upon its own specific facts, and we think a determination of the question raised by intervenor rests upon the view taken of the relationship of "color of title" to the other facts required to supply the necessary elements of adverse possession in a given situation.

The elements necessary to sustain a claim of adverse possession enumerated in the quotation above from Beldner v. General Electric Co. are well established in this state. Krumm v. Streiler, supra; Miller v. Warner, Mo.Sup., 433 S.W.2d 259. It is apparent that a deed describing the claimed property may assist in supplying two of these elements, namely, the requirements (1) that the possession be hostile under a claim of right, and (2) that the possession be open and notorious. Obviously, a deed which is kept secret cannot be hostile, open and notorious as against anyone not a party to the deed. There is no indication in the record that Arthur Henbest or Ray E. Bruner were ever the owners of the lands in controversy, and the deeds, until recorded, could not act as notice to anyone except the grantors.

■ However, adverse possession also requires that the possession of the claimant be under a claim of right. The theory of this requirement is, in part, to bar a mere squatter from the benefits of adverse possession. Missouri Lumber & Mining Co. v. Chronister, Mo.Sup., 259 S.W. 1042. This element may be supplied by other factual circumstances, but in any event will certainly be supplied by entry under a deed, even though the deed may be deficient to convey any title. For this purpose it does not seem to us material whether or not the instrument supplying the "color of title" be recorded. The lack of recordation does not alter the fact that

the claimant receiving a deed valid on its face has an objective basis for considering his possession rightful.

■ We conclude that the Morans did have color of title, at least insofar as that concept relates to establishment of claim of right. Assuming that recordation of the deeds would give the requisite notice of the claim, there appears to be no sound reason why recordation at a delayed date would not operate as notice from the date of recordation. This suit was commenced in 1968, and one of the deeds forming a basis for the claim of the Morans was recorded in 1945 (23 years prior to institution of the suit) and the other two in 1954 (14 years prior to the institution of this suit), so that possession of a part of the tracts from and after the time of recording of the deeds would sustain their claim of adverse possession under color of title. As we have stated, intervenor does not controvert possession of at least part of the tracts by the Morans, and we think the evidence heretofore recited ample to sustain a finding that this possession continued up until the time the suit was commenced.

We do not think it necessary to a decision in this appeal to decide whether recordation is necessary to a claim of possession based upon color of title, nor whether recordation of an instrument otherwise supplying color of title may relate back to possession occurring prior to the date of recordation. Nor do we think it necessary to determine whether the fencing of the tract coupled with the acts of possession by the Morans hereinbefore described constituted possession of the entire area of the three additions irrespective of color of title. All that we do decide is that the Morans had color of title commencing not later than the respective dates of recordation of the instruments purporting to convey title and that, with such color of title, there was a sufficient possession in them for more than the requisite period to vest in them title by adverse possession.

■ The findings of fact and declaration of law of the trial court in the Wilhelm case rest that court's decision upon whether or not Wilhelm acquired title to the lots claimed by him by adverse possession. We do not think that possession by Wilhelm is determinative of the issues in that case. The lots claimed by Wilhelm were conveyed to him by the Morans in October 1959. These were the same lots which were described in the 1944 quitclaim deed from Henbest to the Morans, which deed was recorded in October 1945, fourteen years before the deed from the Morans to Wilhelm. In the view we take of the Moran claim, title by adverse possession was perfected in the Morans after the elapse of ten years (coupled with the possession described in the evidence) from October 1945. Adverse possession confers a full title in fee, as much so as a warranty deed from the owner. Moore v. Hoffman, 327 Mo. 852, 39 S.W.2d 339. Wilhelm therefore took title by virtue of the October 1959 deed from the Morans, in whom title had already been perfected by adverse possession.

■ The lots conveyed by the Morans to the Haileys were also included in the 1944 quitclaim deed from Henbest to the Morans. However, the 1944 deed was recorded October 2, 1945, and the deed from the Morans to the Haileys was dated April 27, 1955, which is a few months short of the period of possession necessary to vest title in the Morans if we assume that the Moran claim depends on possession from the date of recordation of the 1944 deed. We might inquire into those questions we have hereinbefore declined to decide because their resolution was not necessary to a decision in this case. But we again decline such inquiry as going beyond the necessities of this appeal, for we think that the continuance of possession of those lots by the Morans, acting for the Haileys, coupled with payment of taxes by the Haileys, more than adequately establishes possession in the Haileys, which possession may be tacked to the preceding possession

of the Morans to cover the statutory period. Cooper v. Ord, 60 Mo. 420; Hickman v. Link, 97 Mo. 482, 10 S.W. 600.

The claim of Jack Gibbons is perhaps the strongest of those presented by any of the parties involved in this appeal. He acquired at least color of title by the deed from Gertie Moore dated September 4, 1954, which was recorded on September 7, 1954. Thereafter he cleaned up brush on the land, mowed part of it, and set out 1,500 pine trees on the land, maintained a sign on the property, and permitted individuals to use it for specified purposes. Even if these acts did not extend to the entire area of the tract claimed by Gibbons, nevertheless, when coupled with color of title, they constituted possession of the whole. When to these factors is added the payment of taxes on the property by Mr. Gibbons from the time he received the deed in 1954, we think there can be no question of the correctness of the trial court's judgment in the Gibbons case.

■ The State of Missouri is not claiming title by adverse possession, and the deed from Bill Henbest to Don Reed in 1959, and the subsequent conveyance by the latter to the State, could convey good title only if the other parties had not, prior to the date of these conveyances, perfected their claims to the property described in those conveyances. This issue has already been disposed of by our decision on the claims of the Morans, the Haileys, Milt Wilhelm, and Jack Gibbons. Title to the property described in the Henbest-Reed-State deeds of 1959 had already vested in the respective parties hereinbefore indicated. There is no showing that Bill Henbest ever had any interest in the described property, and, if he had, it had been divested by the adverse possession of others so that those 1959 deeds were not effective to convey anything. What we have said does not affect the State's claim to those lots conveyed by the deeds in 1931. Adverse possession cannot run against the State, and we do not understand any of the claimants to contend otherwise.

These cases involve a large number of lots (1,560), some of them bisected by a highway, several parties with differing claims, and numerous deeds with varying methods of describing the property intended to be conveyed. Although upon the fundamental issues we affirm the trial court's judgment, we feel that because of the factual complexity of the cases, certain minor errors have crept into the judgments, and that these should be corrected by the trial court.

We think the award to the Morans of lot 431 of the Second Addition instead of lot 434 may be a typographical error, for we can discern no other explanation for this action.

Two of the lots (207 and 208 of the Second Addition) lie wholly within the state highway right-of-way and should have been excepted from the award to the Morans.

The judgment on the Gibbons case should also be corrected in view of the location of the state highway with reference to the lots awarded to this plaintiff. As previously indicated, lot 209 lies wholly within the highway right-of-way, as do parts of lots 210, 211, 259, 260 and 261, all in the Second Addition. The plaintiff could not have acquired title by adverse possession to the parts of these lots lying within the highway.

The cases are therefore remanded for correction of the above mentioned errors in description, and are otherwise affirmed.

SEILER, P. J., and HOLMAN, J., concur.

BARDGETT, J., not participating because not a member of the Court when cause was submitted.