**ORRICK DEHYDRATING CO., et al., Respondents,**

v.

**Ruth E. EDWARDS, et al., Appellants.**

**No. WD 34146.**

Missouri Court of Appeals, Western District.

May 9, 1984.

Motion For Rehearing and/or Transfer to Supreme Court Overruled and Denied July 3, 1984.

Joseph Y. DeCuyper and Hsiang-Lin Lee, Kansas City, for appellants; Snowden & DeCuyper, Kansas City, of counsel.

David H. Miller, Richmond, for Orrick Dehydrating Co.

A.V. McCalley, Richmond, for American Wilcon Plastic, Inc.

Before PRITCHARD, P.J., and MANFORD and NUGENT, JJ.

PRITCHARD, Presiding Judge.

As to the present parties on this appeal, this suit was begun by Orrick Dehydrating Company, Inc., and American Wilcon Plastic, Inc., against the Edwards for possession of a small triangular tract of land lying in the eastern portion of Orrick, Missouri, in Ray County, Missouri. The defendants, Edwards, counterclaimed alleging that they and their predecessors had been in adverse, open, actual, notorious, hostile, exclusive, uninterrupted and undisputed possession of the real estate since January, 1947, and prayed that all right, title and interest of plaintiffs in the real estate be divested and that title in fee simple be declared to be in defendants by limitation.

The trial court adjudged that Orrick and American Wilcon were the titleholders to the real estate in question, that the Edwards were in possession of it, which, upon demand of same, the Edwards' possession was wrongful and unlawful, "and that the original and continued use of said real estate by the Defendants and their predecessors in title was permissive and not adverse." Judgment was entered for plaintiffs against defendants for possession, but without damages, and defendants were given the right to remove any and all standing crops.

The whole of the land may be described generally as having a point of beginning on the west line of Section 24, Township 51, Range 29, then north along the line 105 feet, east 624.42 feet, south 310.12 feet to the right-of-way of the Wabash Railway, thence in a northwesterly direction 650.47

feet to the point of beginning. Of this whole, the Edwards claim this description as having been acquired by them by adverse possession: "Part of the NW ¼ of the SW ¼ of Section 24, Township 51 North, Range 29 West, Ray County, Missouri and within the corporate limits of the City of Orrick, Missouri, starting at a point on the Northerly right-of-way line of the Old Wabash Railroad Company now the Norfolk and Western Railroad which point is North 584.97 feet along the West line of said ¼ ¼ section from the Southwest corner of said ¼ ¼ Section, thence continuing along the West line of said ¼ ¼ Section, North 105.0 feet to the point of beginning; thence N 87 degrees 44' 12", E, 544.42 feet; thence East 80.0 feet; then South 80 feet; thence to a Northwesterly direction to the point of beginning." The tract claimed is triangularly shaped, containing about ⁴/₁₀ of an acre.

The chain of record title to the whole tract begins with conveyances by Paul and Emma Bailey in 1943 and 1944 to W.J. Small Company. Charles H. Edwards (who died in 1955) and his wife, Sallie, had acquired 30 acres of the tract from the Baileys in 1947, and conveyed it also to the W.J. Small Company in 1951. No deeds from the Small Company have been deposited here, but apparently there were subsequent owners of the whole tract which was acquired by Orrick Dehydrating from Western Alfalfa in 1969 by warranty deed. Orrick Dehydrating erected a large building 300 by 80 feet, an office 30 by 20 feet; two storage tanks, and a "leg" 60 feet. Orrick sold a southern portion of the tract to plaintiff Wilcon Plastic, Inc., containing about 2.029 acres including the large building. Orrick retained a portion of the tract lying to the north of that of Wilcon.

Billy O'Dell, a farmer and president of Orrick, testified that Ruth Edwards' husband, Hank, farmed the land in 1946, and the same land was being farmed at the time of trial, at which time there were crops growing on it, twenty-three 30 inch rows, or 69 feet south of the northeast corner, the rows getting smaller in number to the west (as the triangle tapers), which

land had been farmed since Orrick Dehydrating was formed in 1964, that company having been shut down in 1974.

Wilcon Plastic's finance secretary, Tom McNally, testified merely that it had purchased a portion of the real estate upon which the buildings are constructed, the north line of which runs east and west with a gravel road running adjacent to the east-west building west of a paved road.

Licensed surveyor, James Pack, had surveyed the property in June of 1979 and 1980. He marked the northeast corner with an 18" steel rod, and made survey maps which are in evidence. When he placed the rod, it was in a cornfield, and looking south from the rod, there were 20 to 25 corn rows extending 60 to 80 feet. Looking west from the rod, the cornfield narrowed down and stopped at a fence at the west end, where he placed an "X" on a map to show where the cultivation of corn stopped. The cornfield was 20 to 30 feet north of a mobile home on the property. Pack drew an irregular, wavy line on a map indicating the south line of the area in cultivation, starting at the "X" on the map. West of a post near the "X" there was a pasture or yard but no cultivation.

Witness John Townsend, for plaintiffs, testified that there was cultivation east of the "X" placed on the map by Pack, but there was none west of the "X". On the eastern boundary of the land, the furthermost cultivation (to the south) was 70 feet, and as it ran westward, it ran out to nothing at the "X" point indicated by Pack. On cross-examination, Townsend testified that he was an officer of Orrick; the Edwards family had not paid that company any money for the use of the land, and the company had not contributed to any of the expense for the cultivation.

Billy O'Dell, on recall, testified that W.J. Small (for whom he had worked as a young man) was in a position when he toured the property to view the land to the north of the plant when it was under cultivation.

Freel Edwards is a son of Charles and Sallie Edwards, and had lived in the gener-

al area of Orrick, Missouri, for 72 years. He listed his brothers and sisters as Helen Crabtree, Forrest Edwards, both living, Charles Henry Edwards, deceased, who left Ruth Edwards as his widow who is still living and a party to the action, and Phillip Edwards, deceased, whose son, Phillip Edwards, was still living and a party to the action. Freel remembered when the Baileys sold his father the 30 acres in 1947. Freel, his father and his brother, Henry, farmed the land until 1951. Forrest farmed it from 1951 to 1955, and Henry farmed it from 1955 to 1966 until his death. Freel's three sons farmed it after 1966, and about a month before trial, Freel "laid the beans by". The year before the land was in corn. The southern line of the field that the Edwards used was at about the same place when the Small Company was there, likewise when Archer Daniels Midland and Western Alfalfa had the property. It had not changed since Orrick Dehydrating and American Wilcon Plastic got it, and it was in the same location at the time of trial.

Freel testified further that his family never shared any income from that land with anyone, but they just ran it like it was theirs. No expense money was paid them by way of the companies which operated in the area. The Edwards family continuously occupied the land since acquisition to the present, holding it out as their property and so considering it. No one told them until the present suit that they were farming someone else's land, or to get off of it, and they never received permission from anyone to farm the contested strip and never sought any permission because they believed it was theirs. The property line had never been fenced, and the family just paid the taxes on the statements the county sent them, but he believed that the tax statements were based upon the deeds recorded at the courthouse.

Forrest Edwards, Freel's brother, farmed the disputed land from 1951 to 1954, after which his brother, Henry, and then his nephews, Charlie, Jim and Paul, farmed it, and were farming it at the time of trial. The area had been farmed in substantially the same condition since his father acquired it; he considered it to be the Edwards family property, and to his knowledge, it was generally believed in the community to be the Edwards' farm. Forrest acknowledged on cross-examination that his father (Charles) examined the land descriptions before he purchased a piece of property; that the boundary line was never fenced; and that the taxes the Edwards paid were according to the descriptions as they were recorded. The (disputed) land was plowed up to where the trailer yard takes up. Prior to 1979, he had no conversations with anyone with regard to the boundary line. At the time of trial, his nephews had soybeans growing on the land in question.

The parties join issue on whether the use by the Edwards was permissive throughout the time they cultivated it and removed the crops without sharing them with anyone. The Edwards say that there was no evidence that the use was permissive, and that their evidence showed affirmatively that it was not permissive: Freel Edwards testified that they never received permission from anyone to farm the contested strip and never sought any permission because they believed it was theirs. Plaintiffs' argument proceeds upon the premise that when Charles H. Edwards and wife Sallie conveyed to the W.J. Small company, the deeds were specific as to boundary lines of the here disputed strip of land; that the parties knew of those descriptions and the boundary lines, and therefore Charles' entry upon the land (or his continuance of farming it) was presumptively permissive and his use of it could never ripen into a title by adverse possession. The rule for a presumptive permissive holding, in subserviency to the grantees title, is stated in 3 Am.Jur.2d Adverse Possession, § 33, p. 117. See also 3 Am.Jur.2d Adverse Possession, § 163, p. 245, which states, "Ordinarily, where a grantor continues in possession of the land after execution and delivery of the deed, his possession will be that either of tenant or trustee of the grantee; he will be regarded as holding the premises in subserviency to the grantee. Thus the oc-

cupation of land by a grantor, after conveyance is made, is presumed to be under, and in subordination to, the legal title held by his grantee, for he is ordinarily estopped by his deed from claiming that his holding is adverse. However, this presumption is rebuttable. A conveyance does not, of itself, prevent the grantor from acquiring title by adverse possession as against the immediate and remote grantees." See *Keokuk Investment Co. v. Doerhoff*, 530 S.W.2d 507, 509[4] (Mo.App.1975), citing that authority. See also *Reinheimer v. Rhedans*, 327 S.W.2d 823, 830[7, 8] (Mo.1959), and cases there cited.

■ The record shows that the W.J. Small Company conveyed the property to Archer Daniels Midland Company on August 31, 1951, thus it is an immediate, remote grantee, and the presumption that Charles Edwards was holding in subordination to it would not apply. Thus, Charles' continued farming of the disputed strip from that date up to the time of his death in 1955 could be adverse to Archer Daniels and could therefore be tacked to the adverse possession by other members of the Edwards family up to the time this suit was filed on October 19, 1979. The matter of continuous cultivation and taking crops off the land as constituting adverse possession is more fully discussed below.

■ The elements to establish adverse possession are set forth in *Walker v. Walker*, 509 S.W.2d 102, 106[1] (Mo.1974): "The possession must be (1) hostile, that is, under a claim of right, (2) actual, (3) open and notorious, (4) exclusive, and (5) continuous, for ten years prior to commencement of the action to perfect title by adverse possession." The Walker case had in it two contentions, that the possession by plaintiffs was neither hostile nor exclusive, both of which were ruled for plaintiffs, the court saying at page 106[2, 3], " 'Hostile possession' means possession opposed and antagonistic to the claims of all others, and imports the occupation of land by the possessor with the intent to possess the land as his own. (Citing case.)" [There is no question here, under the evidence, that the

Edwards' possession was from its inception, at least from 1951, exclusive for the purpose of farming it. There is also clear evidence that the possession was actual (the going in to prepare the land, plant it and harvest it); that it was open and notorious (that the Edwards farmed the land was brought home to O'Dell, Orrick's president, by his observance of that activity, and it was obvious to others in the community); and it was continuous for at least 10 years, even back to 1951 as the evidence shows.] Further, on the matter of hostility, it is clear from the testimony of Freel Edwards that they never shared any income from the land with anyone; they ran it like it was theirs; no expenses were paid by any of the companies in the area; and they occupied the land continuously from the acquisition to the present, holding it out as their own, believing it was theirs. Forrest Edwards testified that to his knowledge, the land was generally believed in the community to be the Edwards' farm. In 3 Am.Jur.2d Adverse Possession, § 34, p. 118, 119, "Hostility of possession does not imply an ill will, only an assertion of ownership adverse to that of the true owner and all others. * * * It means only that one in possession of land claims the exclusive right thereto. * * * Continued, unexplained possession of land for a long period of time is evidence that the possession is adverse."

■ Is the uninterrupted cultivation or farming of the disputed strip of land for about 28 years by the Edwards' family sufficient to show adverse possession? The answer must be "Yes". See *Plaster v. Grabeel*, 160 Mo. 669, 61 S.W. 589 (1901), where defendant's predecessors in title went into possession of 40 acres, under a void deed purporting to convey a minor's interest, and cultivated 2, 3 or 4 acres. The Grabeels on acquiring title cleared, fenced and cultivated 10 or 12 acres. The plaintiff lived in the neighborhood and saw and knew of the condition for more than 10 years after he became of age. Held, to show a perfect title by adverse possession to the whole. In *Crismond v. Kendrick*,

325 Mo. 619, 29 S.W.2d 1100, 1112 (1930), there was evidence that Mrs. Crismond had cultivated 80 acres of land for 45 years, held to have ripened into title by adverse possession for her benefit as a life tenant with remainder to her bodily heirs, she not having a fee simple title as held on construction of deeds to her. In *Longbottom v. Rains*, 632 S.W.2d 525, 526 (Mo.App.1982), plaintiffs, relying upon record title, sought to quiet title to a disputed strip of land lying between that owned by the parties, on the north side of which was a fence which was there when Wes Rains bought the property in 1948. The fence was not torn down until 1977. "The land was farmed, used as pasture for cattle and hogs and rented out as pasture since Wes Rains bought his property in 1948. Each time the fence was torn down, twice from 1977 to 1979, J.D. Rains rebuilt it." The court held that this was substantial evidence to support the judgment (based on adverse possession). Note also *Miller v. Warner*, 433 S.W.2d 259, 264 (Mo.1968), holding that continuously recurring acts of clearing, farming, renting and cultivation as far as machinery could go, done in open view of travelers on an adjacent highway, was sufficient to support the finding of adverse possession. Compare *Moseley v. Evans*, 274 Mo. 216, 202 S.W. 1075, 1076, et seq. (1918); *Plaster v. Grabeel,* supra; and *Norton v. Kowazek*, 193 S.W. 556 (Mo. 1917). See also 3 Am.Jur.2d Adverse Possession, § 21, p. 100, and pocket part. Under all the evidence here, there was no proof of permissive use by the Edwards family; their evidence is substantial to support their claim of adverse possession of that portion of the disputed strip which they cultivated, farmed and removed the crops therefrom since 1951. Therefore, it must be adjudged that the trial court was wrong in ruling against the defendant Edwards.

Witness Pack testified that there was no cultivation west of a fence or post where he placed an "X" on the disputed tract, a small area. The Edwards produced no evidence that they farmed that small sliver of land west of where they row-cropped the disputed strip. The judgment is reversed with directions to enter a judgment declaring title to be in defendants as to that portion of the disputed strip lying east of the fence post or "X" placed by Pack, and for further proceedings to determine the description of the west sliver of land to be excluded from the judgment (unless the parties may agree, as they should, as to the extent of the exclusion).

All concur.